Your Honor, this is the second case of the morning called 208-614, People of the State of Illinois v. Clinton-Greathouse. On behalf of the Appellant, Mr. Lawrence Bapst, on behalf of the Appellee, Ms. Joan M. Griffin. Counselor. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. My name is Lawrence Bapst, and I represent Clinton-Greathouse. Mr. Greathouse was convicted of one count of predatory criminal sexual assault and sentenced to 20 years imprisonment. On appeal, we've raised two issues, and I'll address the first. The first issue involved whether or not the State had presented sufficient evidence to show a prima facie case that the collection of the DNA evidence from a blanket was done in a reasonable manner. The blanket itself was identified by the complainant's mother, but the blanket itself was not incriminatory. It was the forensic evidence from the blanket that the prosecutor argued was incriminatory. The prosecutor argued that one stain that was on the blanket contained both DNA from the complainant and my client, and argued that that stain had been created at the same time, simultaneously, when they had sexual relations. Now, in order for that evidence to be admitted, the State was required to make a prima facie showing that it was what they said it was, a stain that was made at the time that my client and the complainant had sexual relations. While the blanket was readily identifiable and not subject to alteration, the DNA was a different type of evidence. That evidence is not relatively impervious to change. So simply having the complainant's mother identify the blanket was insufficient. The State is required to make a prima facie showing that the forensic evidence was collected in a reasonable manner, in such a way that it makes it improbable that it was contaminated. It's our position that they failed to do that. In fact, the evidence that was presented during the State's case in chief showed the opposite, that there's a clear possibility that the stain on the blanket was contaminated. Detective Ives and Officer Perez were the two officers that collected the blanket. Officer Perez did not testify, but Detective Ives was present and watched as Officer Perez collected the blanket. Detective Ives testified that Officer Perez didn't photograph the blanket, he didn't examine the stains on the blanket prior to collecting it, nor did he put a linen protectant on the blanket before he obtained the evidence. These were all measures that could have been used to reasonably protect the forensic evidence on the blanket. Based on Detective Ives' testimony, it appears that basically the blanket was stuffed in an envelope. He testified that Officer Perez folded it in half, folded it in quarters, then rolled it up and then put it in an envelope. The forensic scientist who testified, Kelly Lawrence, indicated that when a blanket is submitted to that sort of treatment, that contamination can occur. Did she not also testify, however, that in her expert opinion it was extremely unlikely that the blanket in this case had been contaminated? She testified to that. She also testified that it was possible, that there was a possibility. And it's our position that the fact that there is a clear possibility that the blanket was contaminated indicates that the State failed in making that prima facie showing. So, well, you threw the word clear in there. Now, did the expert say? She said it was unlikely, in her opinion. She said it was possible. And you just said she said it was clear possible, clearly possible? Well, it's our position that based on what Detective Ives testified, that there is a clear possibility. Well, Ives is not a forensic scientist, is he? No, sir. Well, I mean, couldn't the court arguably attribute more weight to the testimony of the forensic scientist than the detective? It certainly, I'm not arguing that the detective was indicating that there was contamination. The detective's testimony was to the measures that the police used in collecting the blanket. And it's our position that those measures were not reasonable. Officer Perez did not use a limb protectant to keep those stains from being cross-contaminated. And given that, the reasonable measures were not used. That's what the State has to show. They have to show that reasonable measures were used in collecting the blanket. Doesn't that go to the weight, not the admissibility? Your Honor, I don't believe it does go to the weight. I believe that goes to the admissibility. The State is required to make a prima facie showing that it's improbable that the evidence was contaminated. And to do so, they have to show that reasonable measures were used. Wasn't it probable versus possible? Isn't that what your record shows, though? It was possible that it was contaminated but not probable? Yeah, I'm not sure how I can argue the semantics of it, but it's our position that nowhere in this record does it show that a reasonable measure was used in collecting this blanket. There is DNA on this blanket. They know that they're going to try to use this DNA to show that my client and the complainant had sexual relations. They should not have collected it in the manner that they did. Basically, they stuffed it in a sack, and that's not the right way to collect evidence. The evidence that it's not the right way comes from the State's witness, you're saying? Well, initially, Your Honor, the officer who actually collected it, who may have been able to give more information about how he did it, was not available. The detective who watched him do it was the State's witness. Those are people testifying about what did happen. You said that was not the right way to do it, and I want to know who says that way they did it's not the right way to do it. I said, was it the State's expert? No, Your Honor, the detective Ives testified that a linen protectant should have been used, that that was typically used in collecting evidence such as this blanket. Kelly Lawrence also indicated, I believe, that a linen protectant should have been used to preserve this blanket in its original state. Okay, but Lawrence also said it was likely the stains had dried, and therefore it was unlikely that the dry material would have caused contamination simply by being folded together. So let me see if I understand the essence of your argument. You're hanging your hat on the fact that it was not collected in its inception in the proper manner. So therefore, even though the forensic expert testifies, in my opinion, based on the facts of this case, it didn't really matter. I don't believe there was cross-contamination. Therefore, the blanket should have never got in, notwithstanding Lawrence's testimony. That seems to be what you're saying. Lawrence's testimony that the stains probably had dried is speculative. There's no way that she could know when the stains were made, the state of the blanket, when it was collected by Officer Perez. She could not know. She wasn't there when the blanket was collected. Was any expert ever there? I mean, you could knock out all expert testimony in that argument, could you not, that they're speculating? Officer Perez could testify that he examined the blanket, he examined the stains on the blanket, and it was dry when he collected it. He did not testify to that, nor did Detective Ives, and it's our position that that's required to make a prima facie case. So Kelly Lawrence cannot make a prima facie case that the evidence was not compromised by her expert testimony. That seems to be what you're saying. I believe that's correct, Your Honor. The officers who collect the evidence are the only ones who can testify about the reasonable measures that were used to preserve it when they collected it. All she can testify to is, I got this blanket months later. Clearly it's going to have dried by then. What it was like when Officer Perez collected it, he could have said what it was like when Detective Ives saw it. He could have looked at it and seen that it was dry or otherwise. We just don't know because the reasonable measures were not used in this case. They didn't use a limb protectant. There's no evidence that he even examined the stains. Detective Ives testified that he didn't see Officer Perez even examine the blanket before he folded it up, rolled it, and stuffed it in the bag. It's our position that the trial court originally made the correct ruling. In essence, and these aren't his words, but in essence he said at the original ruling on the admissibility of this blanket that the state needed to bring police in to testify to how it was collected and to whether or not it could have been contaminated. And the trial court should have stayed with that ruling. That's what's required of the police. They are required to show that they collected the blanket in a reasonable manner. I've read the second issue, and I'll just briefly address that. It's our position that Mr. Greathouse's defense attorney was unfairly limited in his cross-examination of the witnesses. The issue in this case was credibility. It turned on Mr. Greathouse's testimony versus that of the complainant, and her bias and motive was important in determining whether or not he would be convicted. Defense counsel attempted to cross-examine the victim on her biases against Mr. Greathouse, and he was restricted in that. In addition, defense counsel attempted to show that her inappropriate knowledge of sexual matters came from another incident, and we believe that was important in determining whether or not the jury believed her testimony. The trial court did not allow that, and under the case law, it's relevant in this case whether or not she had prior knowledge of sexual matters. So given that, we think that the cross-examination was unfair and deprived Mr. Greathouse of a fair trial. Were offers of proof made on those objections that were sustained? I don't believe on all of them, but offers of proof were made on some of the objections, yes, Your Honor. And that would be important, obviously, because otherwise how could we tell? There was a prejudice there. Yes, Your Honor. I believe that there was a sufficient offer of proof specifically made regarding the improper knowledge of prior sexual matters that Mr. Greathouse would have testified that she saw the activity between him and the complainant's mother. But not on disciplinary matters and the allegation of IP's anger about? I don't believe that offers of proof were made, but I think it's clear from the record that the defense counsel believed that there was a bias from the victim and that he could show that by questioning her regarding her anger or her being upset with Mr. Greathouse concerning different matters. And I think that was adequate, that he should have been allowed to cross-examine on that. It seemed on those bias and anger issues, the trial court, and I agree, or I don't know if agree is the right word, the trial court didn't frequently give reasons for sustaining the objections, and then we just presume, I guess, that it's relevant, that there's no statement made as to why it's being sustained. But it seemed to me the trial court was concerned about timing, and it seemed like if the questions were narrow enough in the time frame, then they were allowed to go forward. So what's your view of that? I mean, that's my take of what happened. If there has to be some time limitation, you can't just say to the young lady you're, you know, did he ever discipline you? I mean, would you agree there has to be some time limitation? You can't go back a couple years on that? Or what's your view of that? Actually, I probably would not agree with that, Your Honor. I think her bias could go back many years, and that would be relevant. If she had reasons to be upset with him years in the past, she may not have decided at that time to make some claims, but it may have come up later. I do think, on the one you're referring to, I think that defense counsel then limited, tried to limit his cross-examination to 2006. He specifically asked the complainant about we're going to be talking about what happened in 2006. Do you understand that? And she said yes. Then there's a series of questions that he again tries to question her regarding her feelings toward the defendant, and those are objective to and sustained. So I think he did try to limit it. I don't agree that he had to, but I think he did try to limit it, and he was still barred from cross-examining her. This Court has further questions. No, we don't at this time. I'm happy to turn her back. Thank you, counsel. Counsel for the people, please. May it please the Court. Joan Kripke on behalf of the people of the State of Illinois Council. In regard to the first issue on the admission of the blanket and the DNA, as it was briefed, these two issues were sort of mushed together or combined together. But in regard to whether or not we made a prima facie case and having to do with the folding of the blanket and the insertion of a linen protector between the folds, this is really a red herring because between the time when the incident occurred, which was three weeks prior to when the blanket was collected, the people aren't responsible for the condition of the piece of evidence because we don't know that a crime has been committed or there's going to be an allegation of a crime. We're only responsible for the piece of evidence at the time it's collected going forward. So in the past, before it was collected, what we do know is that this blanket was on the bed in the mother's bedroom. She said it never left the bedroom. Clearly the thing was never washed, and she said it hadn't been washed for almost a year. And one can speculate there, was the thing folded and put away neatly when they made the bed? Was it folded on the bed? Was it folded on itself? Was it just jumbled together? You could have had the DNA, if they're saying that you can take a dry stain and a dry stain and push it together and compromise it. It could have been done in the past, and we're not responsible for that having occurred. So what we are responsible for— Even if the state's not responsible for the having occurred, if it occurred and someone else was responsible, then it's not very good evidence, no matter who was responsible for the contamination, right? But that goes to its weight, not its admissibility. Whether or not— If in fact the issue was contamination during a time when the state was responsible, would you say that would go to the admissibility and not the weight? It seems to me that whether the possible contamination happened when the state was responsible for the evidence or not, the result is the same. It's still a question of admissibility and more weight, but it doesn't change because it happened during one person's responsibility versus another. If we had not made a prima facie case, then it was incumbent upon the defendant to show how the blanket was contaminated. And I think we made the prima facie case. Why? Because—and I don't have this in my brief, but I do believe it's in the record, and I apologize. I'm sort of frustrated that it's not in here. I believe Kelly Lawrence didn't only say that it was highly unlikely that the dry stains could have commingled, but she referred specifically to how the DNA manifested itself when she looked at the DNA. And what I recall her testifying was that if there were two dry stains that had been pushed together because of the way it had been folded, the DNA would not have manifested itself in the way that she observed the stain and in the way—as a DNA sample. And what she saw was that the seminal fluid from the defendant and the saliva from the victim were contemporaneously deposited on that blanket. That's what she testified to. And that overrides—well, that's a more succinct and more damning piece of evidence or piece of testimony as to how that stain occurred. Now, she also testified when they pointed out, well, you know, there were all these stains all over this blanket, and she didn't test them. She testified that she was told to look for seminal fluid and saliva, and there was a specific test that she could do for the presence of saliva, which immediately eliminated apparently most of the stains on the blanket. And it's when she found that stain that had the victim's DNA and his DNA combined, that's what she came up with. And she said it was the presence of how that DNA looked to her that it appeared that they had been deposited contemporaneously, that there wasn't a cross-contamination. That's the prima facie case. You're saying her testimony establishes the prima facie, showing that the evidence was not compromised in this case. Yes. And then you also have to go to how could this blanket have been compromised? Now, let's think about this logically. We have detective eyes testifying as to how Officer Perez collected it, and it's also not the job of Officer Perez to testify about the condition of evidence. He's there to say I picked up X, or if he were present, this is what I did. I collected it in this manner. I put it into this packaging. I put my initials on it. I've never read testimony where an evidence tech said I picked up the shell casing and I looked to see if I could see fingerprints. They don't do that. They say I picked it up, put it in a bag, and sealed it. So we have detective eyes saying this is how. . . Let me ask you a question. I mean, Counsel's point was that the officer could have testified as to whether the stains were dry or not, and your position is even if the officer observed that, it would be highly unusual or improper for him to testify that the blanket was dry or some other condition? These are microscopic stains. How's he going to testify whether one stain. . . I don't even think you could see these stains. No one could tell what these stains were. Counsel said dry or not dry. You're right. I don't think somebody's going to look at a shell casing and see a fingerprint. They're not going to look at a blanket and see a microscopic stain and certainly not going to say whether it's been commingled with some other stain. It's a simple observation of whether it was wet or not. Well, a blanket that's wet with a stain from seminal fluid or a blanket that's wet with a stain from saliva might. . . I mean, I can't testify for these people, but I am presuming that they are using gloves. So unless this blanket is soaking wet and dripping on the floor, I don't think that you can take a pair of latex gloves and hold up a blanket and know whether it's wet or not. But isn't that the whole point as to why you would put the protectant between the folds? I don't know why you would put the protectant between the folds because nobody testified to it. I thought that they said that you're. . . I asked the defense counsel whether or not the source for this, why and how it ought to be done was the state's witness or his, and I thought that the state's witness testified that. . . And tell me if I'm wrong or he's wrong, but the state's witness did provide that evidence. I think she did provide the. . . I think she did provide the information, but I don't think she said that this is a set rule that. . . Whether or not she testified about this is in the general course of business how this is done and this is what's expected and this is how you expect to see it, I don't believe she testified as to that. She did testify it wasn't present. I had a blanket. I unfolded it and took it out of a sealed paper bag. So if I may. . . So your position is that she did not testify. That was the question I asked him. What's the evidence as to what the proper way to do this is? And I thought it came from the state's witness and he said it did, but you said she. . . She was no more than an observation witness on that point like the police were? I really. . . I'm trying to recall and I can't recall if she said it was proper or improper. I don't believe she testified, but I may be wrong. I would have to look at the testimony again. I'd be happy to go back and look at it. If you wanted me to rebrief it, I'd be happy to do that. I simply don't have it in my notes, in my recitation of what I thought was important testimony. But I obviously was lacking in certain areas on her testimony because I thought that the focus in this thing was they were objecting as to the collection of the blanket. But if I may get back to how the blanket could have been compromised. Once Officer Perez put the blanket into the paper bag, there was a 13-minute gap of time until he got to the evidence locker at the police department. And there was testimony that it was approximately a 13-minute, 15-minute ride between the house and the police department. And Steve Kelly, who was the evidence locker manager, said, I don't allow anything into evidence unless it's been sealed properly. And Kelly Lawrence, the forensic scientist, also said, when I received the blanket, it was sealed properly with CP, Carlos Perez's name. I didn't detect his argument to be any contamination going afterwards. Unless you have another question, I want you to switch over to these cross-examination issues. I'm biased. Can I just say one thing, though? Sure. In the time of that 13 minutes, the only way the blanket could have been compromised is in two ways. One, somebody washed it. Or two, somebody went and asked the defendant for a sample from him, and then they went to the girl and got a sample from her, and it was placed on the blanket. That's how you can compromise it. Otherwise, according to the testimony of Kelly Lawrence, because the DNA presented in a certain manner, it couldn't have been compromised by the folding. Who established the protocol for how this evidence should have been collected during the trial, or during the motion, the preliminary motions? How was that established by the state? I believe that they brought in the detective Ives was questioned. And Steve Kelly was questioned. And I believe Kelly Lawrence was questioned at the first hearing. For sure at the second hearing. I don't remember between the two. I think all three of those people testified at both hearings. At the second hearing, then, the mother testified to set the foundation that this was her blanket. Because that's what the judge – the judge was sort of kind of all over the place in his – in his rulings. I mean, at first it seemed like he was suppressing the blanket because no one had come in to testify that this blanket came from that home. And I think that's why they then brought in Officer Perez – excuse me, they brought in the mother, Mrs. Perez, to testify that this was her blanket. And then Detective Ives, because it had some unique pattern on it, said, yes, that's the blanket that I saw being collected. Does that answer your question? No, the question is – Oh, I'm sorry. The final finisher showing that this was collected properly. Who testified to that? There was – there were no experts brought in, and there was no question as to whether or not it was – there was nobody who was brought in in the suppression motion to say – they didn't bring in – the defendant didn't bring in a witness to say, this is the protocol, this is how it should be done, and it wasn't done. Nobody. The answer to that is nobody. Okay, I'm sorry, you were questioning the – The cross-examination issue. The cross-examination issue. That's the second point he raised, yeah. I mean, he's got this argument, and if you read these things, I've got some question about that. I mean, they weren't allowed to find out whether the young victim was angry about the father or the defendant moving away, and was she upset at the time? I mean, those – there's a whole lot of questions that he made reference to, so what's – there are a lot of ways in his brief, I think. Right, and we all – I also added more of the – more expansive – More convenience to give a context, right. Correct. If you look at the – this was a very poorly tried case by both the attorneys. The defense counsel was just asking these extremely broad-based, general, confusing, compound questions. I mean, he – at one point, when he did narrow – it's true, he did narrow it down. He said in – he said to the young lady, we're going to talk about the year 2006 when he's – the year of the allegations. Fine. And then he said, in 2006, or in the several months before, and then he made – and then they objected, and the court said – sustained, and he said, well, why, and the judge said, it's to the form of a question. It's a compound question. You're asking too many things for someone to answer these questions. So although the state's attorney also did not give a basis, and the general rule is that when no basis is given, you have to look at relevance, some of it is irrelevant. They were asking the brother, was your – was she afraid of him? Do you know what somebody looks like who's afraid? I mean, when? Why? I mean, did you ever see her cry in front of your stepfather? Well, maybe she cried because the dog died or she saw a sad movie. I mean, these were not put into context. They were not skillfully and artfully drawn questions. As to the offer of proof regarding whether the young girl had prior knowledge of sexual activities, this was a very, very poor offer of proof. What the offer of proof was, the defendant would testify that the wife was performing oral sex on him in front of a window when there was a group of kids outside the window 50 feet or 50 – I can't remember, 50 feet, 50 yards away at a swimming pool, and he looked out the window and saw the victim and she was looking at him. And that's proof that she saw him? I mean, could she see in the window? How do we know? I mean, why didn't he ask this little girl? She was on the stand. He could have said to her on this date, July 13th, did you see this happen? There were a group of kids at your house for the – he never asked her. We didn't know where she was standing, what she was doing. I don't know if she wore glasses, didn't wear glasses, if she was in the swimming pool. It was just speculative. And the law says you can't allow an offer of proof that's just based on so much speculation, which, again, was what he thought she saw. I mean, I asked your opposing counsel whether or not there was some limit on the amount of time that had lapsed between the incident and his position, as you heard him say, was First of all, how old was this? She was nine when it occurred. Okay, so he said, look, even if she was angry at the man for something that happened three or four years earlier, that that should be admissible. What's your view on that? And more important than your view, no disrespect, is what's the law's view on what the time limit is on this? Well, first of all, there's no testimonies to that. What he was trying to get across as to bias was to say she was angry because the stepfather had left the family and had taken up with another woman and was living with her. So, first of all, I personally don't – I mean, again, personally, that's a very confusing way. She's mad because he moved away. My question is narrower. He seemed to indicate to me that he didn't think there would be any time limit that would be at least relevant in the life of a nine-year-old child, that it would be too far out of the time range for the question to be relevant. And that was in response to me saying something that was sort of on your side of the case, which was it seemed the trial judge was trying to keep out stuff that wasn't narrow in time. So the question is, does the law say that if there's going to be questions regarding her bias, her anger, whatever motive she might have to lie about this, what's the time limitation? What does the case law say on that? I don't know what the case law says because I did not look that up. But I don't believe that you can – that it's a proper argument, a fair argument for the defense to say, oh, yeah, you can go back to when she was four or five to show when she was angry. I mean, especially a child, you can be angry at a parent for all kinds of things, and you don't – the parent may be acting very reasonably. Second of all, what they were specifically saying, though, in this case, which there's no evidence that she was angry at him for forever, they were trying to – the assertion of the defense was she was angry because he had moved out of the home. But he didn't say, no, Judge, I'm trying to get at her anger. He moved out of the home two years ago, three years ago, whenever it was, and I want to go back to that. And to that – you know, from the time period of when he moved out of the home until 2006 to figure out if over that period of time she was continually angry at this man. He never made that argument to the court. So the court restricted it to the time of the year around when the incidents were alleged. All right, counsel, your time's up. I think I want to wrap up with a couple of words. You can do that otherwise. I think that the case – I think that the State – well, I do want to say one more thing about the anger thing. At one point he did ask her if – the defense counsel finally managed to ask a question where he would get a proper yes-no answer out of the child, and he didn't get the answer he wanted. She said, did he yell at you or were you angry at him for such and such? And she said no. He didn't get the yes answer that he was expecting to get. But more importantly to the – and if there was any kind of improper ruling regarding the cross-examination, you have to look at it in terms of the greater context of what was going on in this case. The blanket was corroborative of what this little girl had alleged against the father. They had forced her to perform oral sex on him on the mother's bed, and that blanket was on the bed. Now, that's a very specific allegation. And so – and then there was the outcry. She called her mother. She was in tears. And the mother was so – the mother flew home from work. Your time is up. Okay. So I am saying this is summation that there was other – that the blanket was merely corroborative of the girl's allegations and that the State did make a prima facie case that the evidence had been preserved from the time we got it and that there was no evidence put forth by the defense to show how that – how any kind of blanket could have been compromised in any way other than to say perhaps two stains were commingled and that was refuted by the forensic scientist. Thank you. Counsel for the defendant. Thank you, Your Honor. With respect to the second issue and the – whether there's a time limitation, I believe that – I don't believe the case law is very clear on how far back you can go. I know that the Illinois Supreme Court in Kleiner has said that any permissible matter that affects the witness's credibility, if it goes back years, it doesn't matter if it affects her credibility. I mean, do you also agree that the law provides that the scope and the breadth of cross-examination remains within the sound discretion of the trial court? Yes, Your Honor. That's the standard view. As far as the first issue, the – Detective Ives was the one that testified regarding the State's prima facie case that reasonably collected the evidence. That's where all the cases that I've read, that's where the State establishes its prima facie case. The police officers who collect the evidence come in and testify to how they collected the evidence and what they did with it after they collected it. That's where the State presents its prima facie case that forensic evidence or any evidence should be admitted. Right. I would concede, as a former trial judge, I think that's the normal manner in which it's established. But in this case, if she's alluding to, you have the testimony of Lawrence who says, notwithstanding that, whether or not there was some, you know, misstep in the collection, in my expert testimony, I don't believe that there's any contamination of this evidence. Well, I don't believe – And that should be sufficient to overcome the lack of proper collection in the inception. I don't believe that Kelly Lawrence testified that there could not be any contamination. In her opinion, it was unlikely, I believe. She testified that when a blanket is folded, it can result in contamination. And she could not determine if any of the stains were the result of contamination. That was her testimony. But you said it was unlikely that it was contaminated. Did she not say that? She – I don't know. It's not in my brief, and I don't know. I would take for purposes of this argument that she said that. She also said that she could not determine if the stain that the State relies on was the result of contamination. It's possible. And given that, I don't think that negates the lack of evidence that the State collected it in a reasonable manner. The defense doesn't have to bring in an expert on police collection practices to testify that what they did was wrong. The State has to show that what they did was right, and they didn't do anything right in this case. The linen protectant officer, or Detective Ives, testified that that was critical. It was important to prevent contamination. He said that at trial. That's the evidence that I'm relying on to show that what they did was not reasonable. And I think, unless the Court has any questions, that's all I have in my book. No, that's fine. All right, well, thank you both for your arguments. This matter will be taken under advisement, decision issued in due course, and there will be a short recess until the next case.